# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

MOXIE PEST CONTROL (UTAH) LLC, a
Utah limited liability company, MOXIE PEST
CONTROL (MARYLAND), LLC, a
Maryland limited liability company, MOXIE
PEST CONTROL (COLUMBUS), LLC, an
Ohio limited liability company, and MOXIE
PEST SERVICES – DALLAS, LLC, a Texas
limited liability company, MOXIE PEST
CONTROL (VIRGINIA), LLC [sic] a
Virginia limited liability company, MOXIE
PEST CONTROL – DENVER, LLC, a
Colorado limited liability company, MOXIE
PEST CONTROL (LAS VEGAS), LLC, a
Nevada limited liability company, MOXIE
PEST CONTROL (ATLANTA), LLC, a
Georgia limited liability company, MOXIE
LLC, a Missouri limited liability company,
MOXIE SERVICES (CHICAGO), LLC, an
Illinois limited liability company, MOXIE
SERVICES MINNESOTA, LLC, a
Minnesota limited liability company, MOXIE
 PEST CONTROL (ARIZONA), LLC, an
Arizona limited liability company, MOXIE
 PEST CONTROL (PHILADELPHIA), LLC,
 a Pennsylvania limited liability company,
MOXIE PEST CONTROL (TENNESSEE), LLC,
a Tennessee limited liability company, MOXIE
PEST CONTROL (RALEIGH), LLC, a North
Carolina limited liability company, MOXIE
PEST CONTROL (ORANGE COUNTY), L.P.,
a California limited partnership, MOXIE PEST
CONTROL (OKLAHOMA), LLC, an Oklahoma
limited liability company, MISSION PEST
CONTROL, L.P., a California limited partnership,
MOXIE PEST CONTROL (TUCSON), LLC,
an Arizona limited liability company, and
JOSHUA'S PEST CONTROL, L.P., a California
limited partnership.

Plaintiffs,

**\*\*SEALED\*\***
**MEMORANDUM DECISION**
**AND ORDER**

**Case No. 2:21-CV-00240-DAK**

**Judge Dale A. Kimball**

1

v.

KYLE NIELSEN, an individual; CONNOR
RUGGIO, an individual; RYAN SMITH, an
individual, DONALD MOSER, an
individual, APTIVE ENVIRONMENTAL,
LLC, a Utah limited liability company, and
DOES 1-10,

Defendants.

This matter is before the court on seven motions: Defendant Aptive Environmental,

LLC's Motion for Summary Judgment on Plaintiffs' Second Amended Complaint [ECF No.

212]; Defendants Kyle Nielsen, Connor Ruggio, Donald Moser II, and Ryan Smith's Motion for

Summary Judgment on Plaintiffs' Second Amended Complaint [ECF No. 216]; Defendants'

*Daubert* Motion to Exclude Expert Opinion of Ben Scher and the Expert Opinion of Dale Rowe

in Part [ECF No. 234]; Plaintiffs' Motion to Strike Portions of Doug Bania's Expert Report [ECF

No. 235]; Defendants' *Daubert* Motion to Exclude Non-Retained Expert Opinion of Jason

Walton [ECF No. 233]; Defendants' *Daubert* Motion to Exclude Expert Opinion of Sarah Butler

[ECF No. 236]; and Defendants' *Daubert* Motion to Exclude Expert Opinion of Richard

Hoffman [ECF No. 238].

On April 24, 2024, the court held a hearing on the motions. At the hearing, Plaintiffs

were represented by Jared L. Inouye and William P. Cole. Defendants were represented by

Matthew A. Steward and Shaunda L. McNeill. The court took the matter under advisement. Now

being fully informed, the court issues the following Memorandum and Decision.

## BACKGROUND

This case arises from two unrelated occasions in 2019 and early 2021, when two third-

party, independent contractor sales representatives—Brandon Najera and Cayden Johnson—

voluntarily provided third-party sales performance information to Aptive employees. This

2

information was aggregated by and accessible on a third-party owned platform called "SalesRoutes," and consisted of personal sales data of (and input by) third-party contractors like Messrs. Najera and Johnson. Plaintiffs, collectively, the "Moxie Affiliates," are twenty-two separate entities who subscribe to the SalesRoutes platform the view this information. Plaintiffs claim that Defendants stole and benefitted from Plaintiffs trade secret information on the SalesRoutes platform.

## MOXIE

Plaintiffs' recruit and pay hundreds of college-age individuals to go door-to-door in respective geographic areas to sell service contracts.  To organize and enhance recruiting, Plaintiffs routinely contract with companies to recruit for Moxie Affiliates. These companies are referred to as "Sales Companies." An agreement between a Moxie Affiliate and a Sales Company is referred to as a "Services Agreement." These Sales Companies focus on recruiting Sales Representatives to sign an agreement to sell Moxie door-to-door. Sales Companies and Sales Representatives enter into "Independent Contract Agreements," which contractually obligate a Sales Representative to perform services and a Sales Company to pay the Sales Representative for those services. When relevant, Independent Contractor Agreements require Sales Representatives to sign "Joinder Agreements," which identify the respective Moxie Affiliate as a third-party beneficiary and give the Moxie Affiliate the right to enforce the agreement. Both of these contracts contain confidentiality clauses and identify confidential information as "business records and data."

Plaintiffs have a contractual relationship with PestRoutes under which PestRoutes provides services to Moxie Affiliates. PestRoutes services include storing the Moxie Affliates' sales data ("Company Data")—e.g. names of customer, customer address, contract terms, name

of Sales Representative who made the sale, and contract value. PestRoutes also compiles, sorts, processes, and analyzes aggregate Company Data. PestRoutes provides access to an application called "SalesRoutes." Plaintiffs use SalesRoutes to track and analyze Sales Representatives' sales performance.

SalesRoute offers a feature called "Leaderboard," which allows Plaintiffs to visualize sales representative performance in a variety of customizable ways. The Leaderboards list every person who made a sale throughout a given year, his/her total sales, and his/her average contract value. Any person with credentials can configure and visualize sales representative performance. PestRoutes provides a single account to a subscribing company's administrators when that company is implemented on the PestRoutes platform. At that point it is up to the company to then provision the rest of their users who are considered "end users."

Plaintiffs provide a username and password to each Sales Representative after they sign the Joinder or Independent Contractor Agreement. Thus, before a Sales Representative receives access to SalesRoutes, it is Plaintiffs practice and policy to require such Sales Representative to obtain a unique username and password and enter into a confidentiality agreement.

**Disclosure of Leaderboards**

Although some Company Data is used and disclosed by Plaintiffs for business purposes, including posting images on social media, in no instance have Plaintiffs authorized disclosure of an entire Leaderboard. The Yearly Leaderboards are only available to persons who have a username and password, which consists of those performing services for Plaintiffs. The information publicly disclosed is a very small portion of the Company Data maintained.

Yearly Leaderboard data would be valuable to a competitor, and no Moxie Affiliate has ever authorized the disclosure of a Yearly Leaderboard to a competitor such as Defendant.

**Defendants' Acquisition of Leaderboards**

On June 6, 2019, Senior Vice President of Aptive Ruggio sent out a request to a group of Aptive sales leaders to misappropriate the internal sales representative performance data of the Moxie Affiliates so that they could "squash moxie." In or about August 2019, Smith offered to pay Najera to acquire this information. Najera signed a "Joinder Agreement" with Plaintiffs on or about March 2, 2019. In that agreement, Najera promised to "hold in the strictest confidence, not to use except for the sole benefit of [Moxie], and not to disclose to any entity or person, any Confidential Information that I obtain or to which I have access as a result of performing Services." Ruggio offered to pay Smith $100 if he could get the 2019 Moxie Yearly Leaderboards from Najera. This same bribe was offered to Najera.

On or about September 17, 2019, Najera took a video of himself scrolling through the 2019 Moxie Leaderboards. He then transmitted this video to Smith, who, on behalf of Ruggio and Pearson (Aptive's CEO), requested clearer images. Najera then transmitted screenshots of the 2019 Moxie Leaderboards to Smith, who sent them to Ruggio. Ruggio informed Smith that he was going to use the data to create a "spreadsheet with some other companies [. . .] to use in recruiting."

The next year, Ruggio offered $1,000 to anyone who obtained screenshots of a competitor's sales information. On July 30, 2020, Warner, who was in Ruggio's sales network, sent a text message to two persons, asking, "What are the chances you guys can get all of Moxies [*sic*] numbers from someone?" One of the recipients replied that he knew a VP of Moxie and Warner responded that it "needs to be a lower level person most likely."

On October 10, 2020, Michale Eddington, an Aptive sales leader, sent a message to the *Sales Regionals group messaging thread, "Who has a Moxie database they can send me?" Ruggio responded: "Let's get data on them for this year. I'll pay any of you $1,000 to help get it."

That same month, Aptive's President of Sales, Nielsen, met with Johnson at Aptive's headquarters. At that meeting, Nielsen told Johnson he would pay Johnson a bribe in exchange for access to Moxie's SalesRoutes account. On December 23, 2020, Johnson entered into a Joinder Agreement with Moxie Utah, which included a confidentiality clause. Moxie Utah provided Johnson with SalesRoutes login credentials on January 11, 2021. On this same day, Johnson went to Aptive's headquarters in Provo, Utah to meet with Nielsen and gave him his login credentials. As compensation, Nielsen paid Johnson $2,000 via Venmo and gave him a pair of collector Nike sneakers.

Just a day after obtaining these credentials, a representative of one of the Moxie Affiliates sent a text message to Nielsen stating, "I hear you guys are looking at our sales routes numbers." Nielsen falsely replied, "Not that I've heard. Can you be more specific so I can look into it?" Nielsen then told Johnson to destroy evidence of their interactions.

After logging into SalesRoutes, Nielsen took screenshots and a lengthy video screen recording of Moxie Affiliates' Yearly Leaderboards for 2020. These were distributed to Ruggio and Moser. They, in turn, distributed this information throughout the Aptive organization, and Nielsen, Ruggio, and Moser encouraged Aptive sales leaders to use this information to recruit sales representatives.

As a result of these events, Plaintiffs have brought DTSA and UTSA claims against Defendant Aptive. They have also brought UTSA, DTSA, and RICO claims against Defendants Kyle Nielsen, Connor Ruggio, Donald Moser II, and Ryan Smith (collectively, "Individual Defendants").

<strong>STANDARDS OF REVIEW</strong>

**I.    *DAUBERT***

To determine whether an expert opinion is admissible, the district court performs a two-step analysis. *Orenstein v. United States*, No. 2:10CV348 DAK, 2013 WL 595766, at *2 (D. Utah Feb. 15, 2013)(unpublished). First, "the court determines whether the expert is qualified by 'knowledge, skill, experience, training or education' to render an opinion. *Id*. Once this first step is satisfied, the court determines "'whether the expert's opinion is reliable under the principles set forth in *Daubert*.'" *Id*.

**II.    SUMMARY JUDGMENT**

Summary judgment is appropriate when, "viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in their favor, the movant establishes that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law." *Prince v. Sheriff of Carter Cnty.*, 28 F.4th. 1033, 1043 (10th Cir. 2022). A "genuine" dispute of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to decide whether there is a genuine issue for trial." *Id*.

<strong>DISCUSSION</strong>

**I.    <u>DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE EXPERT OPINION OF BEN SCHER, AND THE EXPERT OPINION OF DALE ROWE IN PART.</u>**

Mr. Scher and Mr. Rowe were retained by Plaintiffs to provide insight into the secrecy of the SalesRoutes Leaderboards. Mr. Scher is a certified "data analyst," whose opinion addresses Defendants' production of hundreds of screenshots of varying compilations of the SalesRoutes Leaderboards that were posted publicly online by Plaintiffs' sales representatives and companies. The "task" Mr. Scher was assigned was to determine whether the sales performance data contained in the Social Media Examples could be used to recreate the compilation of sales performance data contained in the 2019 and 2020 SalesRoutes Leaderboards.

Expert testimony is only admissible so long as it is relevant. *Heer v. Costco Wholesale Corp.*, 589 F.Appx 854, 860–61 (10th Cir. 2014). In their motion, the crux of Defendants' argument is that the opinions of Ben Scher and Dale Rowe are not relevant. Relevancy is not a high standard, as evidence is relevant if it has *any* tendency to make a fact more or less probative than it would be without the evidence and the fact is of consequence in determining the issue. *Cscucha v. Best Friends Animal Society*, 524 F.Supp.3d 1196, 1198 (D. Utah 2021). A fact is "of consequence" when its existence would provide the factfinder with a basis for making some inference about an issue that is necessary to the verdict. *United States v. Ballou*, 59 F.Supp.3d 1038, 1048 (D.N.M. 2014).

Here, the testimony of Ben Scher and Dale Rowe is relevant. Mr. Scher's opinions are responsive to Defendants' own arguments that the social media posts they produced in discovery purportedly prove that the 2019 and 2020 Leaderboards are "readily ascertainable." Mr. Scher analyzed these social media posts because "they are precisely the body of posts Defendants claim show that the allegedly misappropriated data are public." Accordingly, the testimony of Ben Scher and Dale Rowe is relevant, and Defendants' motion is denied.

## II.   DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE NON-RETAINED EXPERT OPINION OF JASON WALTON

Mr. Walton intends to provide expert testimony that the "type" of data contained in the SalesRoutes Leaderboards has "value to, and could be used by, a competitor in the industry" in a variety of ways. Mr. Walton is not being called to offer any opinions about how Defendants used the data compilations. He is instead relying on his experience to explain the value of the data and how it would serve a competitor in the industry. Where an expert witness relies on experience, the expert must "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014). Plaintiffs have satisfied this burden. Mr. Walton is a founder and principal of each Plaintiff in this case. He has owned and operated door-to-door pest control companies for decades. As a result of this experience, he has extensive knowledge regarding the industry. Specifically, he knows what kind of data is valuable, what the data reflects, and what it could be used for. As such, his experience serves as a sufficient basis for his opinions regarding the value of the data at issue.

Defendants argue that Mr. Walton's opinion should be excluded because he is a non-retained expert, and non-retained experts can only testify with respect to their participation in the underlying events at issue. *See, e.g., Guarantee Tr. Life Ins. Co. v. Am. Med. & Life Ins. Co.*, 291 F.R.D. 234, 237 (N.D. Ill. 2013). Defendants argue that Mr. Walton's testimony does not satisfy this burden because his expert opinion is actually a speculative proposition: How can any competitor *not* use the "extremely valuable" SalesRoutes Leaderboards in the ways Mr. Walton would assume? This argument fails. The distinction between "retained," and "non-retained" experts has nothing to do with Rule 702 or *Daubert*. The cases cited by Defendants in this regard concern the scope of disclosure obligations under Fed. R. Civ. P. 26(a)(2), not admissibility

under Rule 702. Here, in contrast to those cases, Defendants have not brought any motion under Fed. R. Civ. P. 37(c) to challenge whether the Rule 26(a) disclosures of Mr. Walton's opinions were adequate. For these reasons and those discussed above, Defendants' motion is denied.

### III.   PLAINTIFFS' MOTION TO STRIKE PORTIONS OF DOUG BANIA'S EXPERT REPORT

A component of an unjust enrichment calculation is a deduction of the defendant's costs from gross revenue. Plaintiffs served an expert report setting forth a calculation of Defendants' unjust enrichment (the "Hoffman Report"). In response to this report, Defendants filed Doug Bania's expert rebuttal report. This report criticized Plaintiffs for failing to take into account all of Aptive's purported direct costs. In reaching his opinion, Bania relied on Document 4a, which was provided to him by Defendants. Defendants never provided Plaintiffs with a copy of this document. Plaintiffs argue that Doug Bania's Report should be excluded because it is based on undisclosed information that Plaintiffs properly sought in discovery and, therefore, violates Federal Rules of Civil Procedure Rule 37(c). They also argue that Bania's unjust enrichment claim is unreliable. These arguments fail for the following reasons.

First, there is no basis for sanctions under Rule 37. Defendants were under no obligation to produce, disclose, or supplement this information unless and until Rule 26(a) required its disclosure. It is also worth noting that a party is only required to respond to an interrogatory or 26(a) disclosure to the "extent that the information requested is not the subject of expert testimony." *Fractus, S.A. v. ZTE Corp.*, 2019 WL 5697205, at *3 (N.D. Tex. Nov. 4, 2019). For expert disclosures, the deadline for parties not bearing the burden of proof to produce their Rule 26(a)(2) expert reports was July 14, 2023. (Scheduling Order, Doc. 200, at p.2). This disclosure was filed on July 14, 2023, and was therefore timely and proper.

Furthermore, Plaintiffs argue that Bania's report should be excluded because in general, experts must "base their opinions on evidence already produced in discovery or otherwise available to both parties in the public sphere." *Ford Motor Co. v. InterMotive, Inc.*¸ 4:17-cv-11584, 2021 WL 1923414, *3 (E.D. Mich. May 13, 2021). However, at the 30(b)(6) Deposition of Aptive, Plaintiffs were given the opportunity to ask questions about the direct costs incurred by Aptive to provide pest-control services to a residential customer. The fact that Plaintiffs failed to inquire about information that Mr. Hoffman would later need is not a reason to sanction Defendants.

Plaintiffs also argue that Mr. Bania's report is unreliable because he relied on documents produced specifically for this lawsuit. Again, Plaintiffs' argument fails. An expert may rely on a report prepared in anticipation of litigation so long as it has sufficient indicia of reliability. *United States v. Marine Shale Processors*, 81 F.3d 1361, 1370 (5th Cir. 1996).  Bania's expert report clearly states exactly what documents and data he relied on in forming his opinion. He relied on Schedule 1(a) and Schedule 1(b) to calculate Aptive's direct costs. Both of these documents have been disclosed in Mr. Bania's expert report. Plaintiffs argue that Bania's opinion is unreliable because the information contained in Schedule 1(a) and Schedule 1(b) was originally contained in Document 4a, which Defendants have not produced. But Mr. Bania did not rely on Document 4a. He relied on the documents which he has disclosed. Thus, Defendants have met the requirements for disclosure under Rule 26, and the motion is denied.

## IV.     DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE EXPERT OPINION OF SARAH BUTLER

Ms. Butler's opinion is not being used to establish causation. In her expert report, Ms. Butler explains that she was asked to "evaluate what would influence a job seeker to learn more about a potential employer and what factors and types of information would cause a potential sales

representative to be more interested in taking a job with a particular pest control company."
Plaintiffs have made clear that they do not intend to use the survey as evidence of causation, but
instead to reveal what kinds of factors influence potential recruits.

In their opposition, Plaintiffs state that "[Ms.] Butler's opinion is not a causation
opinion." Opp. At 4.  Yet, in the very next sentence, Plaintiffs proclaim their intent to proffer her
opinion as "one piece of evidence . . . that will show Defendants' actions harmed Plaintiffs." *Id*.
This seems to indicate causation. Nevertheless, Ms. Butler's opinion is just the 38.6% "survey
result." This alone only indicates that 38.6% of potential recruits would be more interested in
taking a job if a sales representative indicated that the company provided better compensation or
had a better track record of sales. This result merely discloses a factor and does not establish
causation. Thus, Ms. Butler's opinion is not a causation opinion.

Because of this, the facts here are easily distinguishable from those in *Wyndham*.
*Wyndham Vacation Ownership, Inc. v. Sussman*, 2021 WL 4948099 (M.D. FL. Sept. 20, 2021).
In *Wyndham*, the opinion was being asserted to establish causation. *Id*. at *1. The survey that was
used was also much more specific than the one at issue here, as it used the actual marketing and
company logos that were at issue. *Id*. Here, the SalesRoutes Leaderboards were not shown to the
survey responders. Instead, they were simply asked what kinds of factors would influence them
in choosing a job.

The survey here is also in line with the *Hodgdon* survey requirements, including surveying a
"universe [that] was properly chosen and defined." *Hodgdon Power Co., Inc. v. Alliant
Techsystems, Inc.*, 512 F.Supp.2d 1178, 1181 (D. Kan. 2007). Ms. Butler surveyed 306 adult
males aged 18–35 who indicated they would consider selling pest control services door-to-door

within the next twelve months. This encompasses the average age group that Defendants hire, which is 18–23-year-old males.

Defendants also argue that Ms. Butler's opinion should be excluded under the doctrine of judicial estoppel. "The purpose of the judicial estoppel doctrine is to 'protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *Barker v. Citigroup, Inc.*, No. 2:11-CV-51, 2012 WL 1379308, at *3–4 (D. Utah Apr. 20, 2012) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001)). Judicial estoppel does not apply here because Defendants are not changing their legal position in any way. This argument, therefore, fails.

For these reasons, Defendants motion is denied.

## V.      DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE EXPERT OPINION OF RICHARD HOFFMAN

In his expert report, Mr. Hoffman explains that Plaintiffs informed him that they will assert at trial that Confidential Information was used 80% of the time during recruiting in 2020 and 40% of the time in 2021. Hoffman based his opinions on assumptions that Plaintiffs expect to prove at trial. This is permissible, as established in *Greystone Funding Co., LLC v. Network Funding, L.P.*, 598 F.Supp.3d 1228 (D. Utah 2022). There, the Plaintiff sued for trade secret misappropriation and produced an expert that relied "on the assumption that the allegations in [the plaintiff's] complaint would be prove[n] at trial" in calculating damages. *Id*. at 1234. The defendant moved to exclude the testimony because the expert "did not rely upon, obtain, or consider sufficient information necessary to complete a proper damages analysis, rending his opinions speculative [and] unreliable." *Id*. at 1235. The court disagreed and held that sufficient evidence existed to support a jury determination that the defendant's conduct "caused [the

plaintiff's] alleged damages. *Id*. at 1236–37. *Greystone* applies to this case. Hoffman based his opinions on assumptions that Plaintiffs expect to prove at trial.

Furthermore, there is a different standard for establishing the fact of damages (causation) and the amount of damages. Once a defendant "has been shown to have caused a loss, the defendant should not be allowed to escape liability because the amount of the loss cannot be prove[n] with precision." *Diversified Striping Sys. Inc. v. Kraus*, 2022 UT App 91, ¶ 54, 516 P.3d 306. Thus, "[d]amages cannot be speculative, but this only means that the facts of damages, not their amount, cannot be uncertain." *Allied Erecting & Dismantling Co., Inc. v. Genesis Equip. & Mfg., Inc.*, 649 F.Supp.2d 702, 719 (N.D. Ohio 2009). The 80/40 figure goes to the amount of damages, not the fact of damages. As such, Hoffman's assumption surrounding these numbers is permissible.

Finally, if the jury disagrees with Hoffman's specific calculation, they can still use his damages model to arrive at a different number. This also applies to the 80/40 assumption. Defendants do not challenge the reliability of Hoffman's model, just his specific calculations.

For these reasons, Defendants' Motion is denied.

## VI.   DEFENDANT APTIVE ENVIRONMENTAL, LLC'S MOTION FOR SUMMARY JUDGMENT

To succeed on a trade secret misappropriation claim, the plaintiff must show: 1) the existence of a trade secret, 2) communication of the trade secret under an express or implied agreement limiting disclosure of the secret, and 3) use of the secret that results in injury. Here, Plaintiffs satisfy the first two elements. However, there is not sufficient evidence for the third requirement of causation. As a result of this, the evidence is not such that a reasonable jury could return a verdict for the nonmoving party, and Defendant's motion is granted. Each of these elements is discussed in turn below.

First, there is sufficient evidence such that a reasonable jury could conclude that the SalesRoutes Leaderboards were a trade secret. "A DTSA trade secret includes all forms and types of information that [1] derives value from being secret and [2] that the owner took reasonable measures to keep secret." *John Bean Techs. Corp. v. B GSE Grp., LLC*, 480 F.Supp.3d 1274, 1302 (D. Utah 2020). Here, there is evidence that satisfies these two requirements. The contract between PestRoutes and Plaintiffs indicates that Plaintiffs own the data generated by the PestRoutes application. The Terms of Service clearly states that Plaintiffs own their Company Data, which includes data "provided, generated, transmitted or displayed via the Services."

Furthermore, there is sufficient evidence for a reasonable jury to conclude that Plaintiffs took reasonable measures to keep their information secret. Caselaw demonstrates that confidentiality agreements coupled with password-protected access are standard and reasonable measures of protection. *See*, *e.g.*, *Movie Gallery US, LLC v. Greenshields*, 648 F.Supp.2d 1252, 1264 (M.D. Ala. 2009). PestRoutes provides subscribing companies with a password and username that the company can then distribute to end users as they see fit. Plaintiffs would distribute this information to Sales Representatives and then terminate the information at the conclusion of the Sales Representatives employment. This password information was also only given to Sales Representatives after they signed a Services or Joinder Agreement. Both of these agreements contain clauses that prohibit employees from disclosing confidential information, including company data. Thus, the information contained in the SalesRoutes Leaderboards was protected by a password and a confidentiality agreement, which is a reasonable measure of protection. For these reasons, there is sufficient evidence from which a reasonable jury could find the existence of a trade secret.

15

As to the second requirement of a trade secret misappropriation claim, the Leaderboards were communicated under an express or implied agreement limiting disclosure of the secret. As explained above, both the Joinder and Services Agreements contained a confidentiality clause that incorporated the company's data. Although some of the SalesRoutes Leaderboard information was posted on social media, a lot of it wasn't.  Moreover, a partial disclosure of confidential information does not foreclose the possibility of a trade secret." *In re Review of Alternative Energy Rider Contained in Tariffs of Ohio Edison Co.¸* 106 N.E.3d 1, 11 (Ohio 2018); *General Water Tech. Inc. v. Zweden*, 515 P.3d 956, 2022 UT App 90, ¶ 37. Accordingly, there is sufficient evidence for this second requirement.

The third factor, use of the secret that results in injury, is where Plaintiffs' claim fails. Plaintiffs have not provided sufficient evidence to demonstrate causation. Plaintiffs need to show that it was "more likely than not" that the alleged misappropriation of the SalesRoutes Leaderboards caused ill-gotten profits to Aptive. *GeoMetWatch v. Hall*, No. 1:14-cv-00060, 2018 WL 6240991, at *13. "Where the proximate cause of the injury is left to conjecture, the plaintiff must fail as a matter of law." *Id*. at *11. Speculation is the "act or practice of theorizing about matters over which there is no certain knowledge." *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1204 (10th Cir. 2022). Inference, on the other hand, is a "deduction as to the existence of a fact from which human experience teaches us can reasonably and logically be drawn from proof of other facts." *Id*.

Here, Plaintiffs assert several facts from which they argue a reasonable jury could find causation: 1) Moser showed Benson the SalesRoutes Leaderboards and this "influenced" his decision to join Aptive, although he never sold for them; 2) For several years, Aptive bribed and offered cash rewards to anyone who could steal the Yearly Leaderboards; 3) From 2016 to 2020,

Nielsen's sales network grew from 200 reps to 600 reps; 4) In 2021, Moser's sales network grew from 140 sales representatives to 190 sales representatives—a 35% increase; 5) In 2019, Aptive had 1,703 total sales representatives, but in 2020 (after Aptive used the 2019 Leaderboard in its recruiting efforts), Aptive's total number of sales representatives jumped to 2,600, and in 2021 they jumped to 3,300; 6) Aptive experienced $37 million in revenue growth in 2020 and $31 million in revenue growth in 2021; and 7) Butler's survey evidence shows that among a sample population of males aged 18–35 who would consider selling pest control services door-to-door, 38.6% of them would be more interested in taking a job with a company that provided better compensation or had a better track record of sales.

These factors do not provide sufficient evidence from which a jury could find causation. They are speculative in nature. Fact 1 cannot be used to determine causation because Zak Benson resigned before he sold for Aptive, so Defendants were not unjustly enriched by his services. As to Fact 2, bribing individuals to steal the leaderboards is unprofessional behavior, but it does not indicate enrichment or causation.  Facts 3, 4, 5, and 6 confuse correlation with causation, and thus, do not establish causation. *Richmond v. Wampanoag Tribal Ct. Cases*, 431 F.Supp. 2d 1159, 1182 (D. Utah 2006). Finally, Fact 7 is not causation evidence. As explained in the Butler *Daubert* analysis, the survey created by Ms. Butler merely looked at factors individuals would consider in choosing a job. It did not establish causation. For these reasons, Plaintiffs cannot satisfy the causation burden, and this court should grant Defendant's motion.

## VII. DEFENDANTS' KYLE NIELSEN, CONNOR RUGGIO, DONALD MOSER II, AND RYAN SMITH'S MOTION FOR SUMMARY JUDGMENT

For the same reasons in the Analysis of Defendant Aptive's Motion for Summary Judgment, the Plaintiffs cannot establish causation. Accordingly, the Individual Defendants are entitled to summary judgment on the UTSA and DTSA claims. The Individual Defendants are

17

also entitled to summary judgment as to the RICO claim. To allege a RICO claim a Plaintiff

must show (1) the defendants participated in the conduct (2) of an enterprise (3) through a

pattern of (4) racketeering activity. *See Tal v. Hogan*¸ 453 F.3d 1244, 1261 (10th Cir. 2006). The

plaintiff is also required to "show that a RICO predicate offense 'not only was a 'but for' cause

of his injury but was the proximate cause as well.'" *Hemi Grp., LLC v. City of New York*, 559

U.S. 1, 9 (2010). "Sufficiently establishing the element of causation—both actual and

proximate—is crucial to proving any violation of RICO." *CGC Holding Co., LLC v. Broad and

Casset*, 773 F.3d 1076, 1083 (10th Cir. 2014).

For the same reasons discussed in the analysis of Aptive's Motion for Summary

Judgment, Plaintiffs cannot establish causation. For these reasons, this court grants the Individual

Defendants' Motion for Summary Judgment.

## CONCLUSION

This court DENIES all *Daubert* Motions, and GRANTS both Defendant Aptive's and the

Individual Defendants' Motions for Summary Judgment. Accordingly, the Clerk of Court is

instructed to close this case. This Memorandum Decision and Order ("MDO") is being filed

under seal because the memoranda filed in connection with the pending motions were filed under

seal. Within ten days of the date of this Order, the parties shall inform the court of what portions

of the MDO must remain under seal and provide the court with a redacted version of the MDO

that can be entered in the case docket for the public.

DATED this 11th day of June 2024.

BY THE COURT:

DALE A. KIMBALL
United States District Judge