Brent O. Hatch (5715)
hatch@hatchpc.com
Adam M. Pace (14278)
pace@hatchpc.com
**HATCH LAW GROUP PC**
22 East 100 South, Suite 400
Salt Lake City, Utah 84111
Telephone: (801) 869-1919

*Attorneys for Plaintiffs*

---

**IN THE UNITED STATES DISTRICT COURT FOR**

**THE DISTRICT OF UTAH, CENTRAL DIVISION**

---

| | |
|---|---|
| MOXIE PEST CONTROL (UTAH), LLC, a Utah limited liability company; MOXIE PEST CONTROL (MARYLAND), LLC, a Maryland limited liability company; MOXIE PEST CONTROL (COLUMBUS), LLC, an Ohio limited liability company; MOXIE PEST SERVICES – DALLAS, LLC, a Texas limited liability company; MOXIE PEST CONTROL (VIRGINIA), a Virginia limited liability company; MOXIE PEST CONTROL – DENVER, LLC, a Colorado limited liability company; MOXIE PEST CONTROL (LAS VEGAS), LLC, a Nevada limited liability company; MOXIE PEST CONTROL (ATLANTA), LLC, a Georgia limited liability company; MOXIE PEST CONTROL (CINCINNATI), LLC, an Ohio limited liability company; MOXIE | **THIRD AMENDED COMPLAINT**<br><br>**(JURY TRIAL DEMANDED)**<br><br>Case No. 2:21-CV-00240<br><br>Judge Ted Stewart |

| | |
|---|---|
| SERVICES, LLC, a Kansas limited liability company; MOXIE SERVICES ST. LOUIS LLC, a Missouri limited liability company; MOXIE SERVICES (CHICAGO), LLC, an Illinois limited liability company; MOXIE SERVICES MINNESOTA, LLC, a Minnesota limited liability company; MOXIE PEST CONTROL (ARIZONA), LLC, an Arizona limited liability company; MOXIE PEST CONTROL (PHILADELPHIA), LLC, a Pennsylvania limited liability company; MOXIE PEST CONTROL (TENNESSEE), LLC, a Tennessee limited liability company; MOXIE PEST CONTROL (RALEIGH), LLC, a North Carolina limited liability company; MOXIE PEST CONTROL (ORANGE COUNTY), L.P., a California limited partnership; MOXIE PEST CONTROL (OKLAHOMA), LLC, an Oklahoma limited liability company; MISSION PEST CONTROL, L.P., a California limited partnership; MOXIE PEST CONTROL (TUCSON), LLC, an Arizona limited liability company; and JOSHUA'S PEST CONTROL, L.P., a California limited partnership.<br><br>Plaintiffs,<br><br>vs.<br><br>KYLE NIELSEN, an individual; CONNER RUGGIO, an individual; APTIVE ENVIRONMENTAL, LLC, a Utah limited liability company; DONALD "DONNY" MOSER II, an individual; RYAN SMITH, an individual; and DOES 1-10,<br><br>Defendants. | |

Plaintiffs, through counsel, hereby submit this complaint against Kyle Nielsen ("Nielsen"), Conner Ruggio ("Ruggio"), Aptive Environmental, LLC ("Aptive"), Donald "Donny" Moser II ("Moser"), Ryan Smith ("Smith"), and DOES 1-10.

**INTRODUCTION**

***The Genesis of this Third Amended Complaint***

1. On January 12, 2021, Moxie Pest Control executives received news of a startling and disturbing discovery: someone sitting in Moxie's largest *competitor's* headquarters in Provo was at that very moment accessing Moxie's proprietary sales database.

2. Moxie immediately began investigating. Within days, Moxie had determined that a top executive of competitor Aptive Environmental had paid a young man two thousand dollars and a pair of collectible athletic shoes to give his Moxie user name and password to Aptive for the purpose of stealing Moxie's critical business information.

3. This finding gave rise to this lawsuit. And discovery in this case has in turn revealed that the January 2021 data theft was not a one-off event, but instead part of a far deeper and broader conspiracy among the Defendants to lie, cheat, and steal Aptive's way to the top.

4. Indeed, discovery in this case demonstrates not only that Aptive personnel had stolen the Plaintiffs' sales data in prior years as well, but also that Aptive personnel were using the same tactics to steal the same types of data from its other major competitors in the summer sales pest control industry.

5. This Third Amended Complaint thus addresses the expanded scope of

Defendants' acts as Plaintiffs currently understand them.

***Industry Background***

6. Summer sales pest control is big business. On information and belief, the top five summer sales pest control businesses—Aptive, Hawx, Greenix, Vantage, and Moxie— had aggregate gross revenues of more than $1 billion in 2021.

7. The basic business model is relatively straightforward: summer sales pest control companies pay young, typically college-aged sales representatives commissions to sell pest control services door-to-door throughout late spring and summer in markets throughout the country.

8. Sales commissions are typically a percentage of the one-year value of the customer's contract. For example, if the sales representative has agreed to a 70% commission rate and the total first-year value of a particular contract is $600, the sales representative will receive 70% of that amount—or $420—provided that the customer is up- to-date on their payment obligations at a predetermined point.

9. Summer sales pest control companies thus generally earn the bulk of their net revenue on later years of their service contracts.

10. Aptive – the entity with which all the individual Defendants are or were affiliated as officers, employees and/or shareholders – is the 800-pound gorilla of the industry.

11. Moxie founder Jason Walton gave Aptive founder David Royce his start in the industry; Royce founded Aptive in 2015 after selling the pest control accounts associated

with two of his earlier businesses.

12. Aptive's estimated annual revenue in 2021 was $477 million, and Aptive's trajectory suggests it may be on-track to reach its stated goal of over $1 billion in annual revenue by 2025. Unfortunately, as described hereafter, Defendants resorted to bribery, fraud and theft to grow.

## PARTIES

13. Plaintiff Moxie Pest Control (Utah), LLC ("Moxie Utah") is a Utah limited liability company with its principal place of business located in Murray, Utah.

14. Plaintiff Moxie Pest Control (Maryland), LLC ("Moxie Maryland") is a Maryland limited liability company that conducts business in Maryland.

15. Plaintiff Moxie Pest Control (Columbus), LLC ("Moxie Columbus") is an Ohio limited liability company that conducts business in Ohio.

16. Plaintiff Moxie Pest Services – Dallas, LLC ("Moxie Dallas") is a Texas limited liability company that conducts business in Texas.

17. Plaintiff Moxie Pest Control (Virginia), LLC is a Virginia limited liability company that conducts business in Virginia.

18. Plaintiff Moxie Pest Control (Las Vegas), LLC is a Nevada limited liability company that conducts business in Nevada.

19. Plaintiff Moxie Pest Control (Atlanta), LLC is a Georgia limited liability company that conducts business in Georgia.

20. Plaintiff Moxie Pest Control (Cincinnati), LLC is an Ohio limited liability

company that conducts business in Ohio.

21. Plaintiff Moxie Services, LLC is a Kansas limited liability company that conducts business in Kansas.

22. Plaintiff Moxie Services St. Louis, LLC is a Missouri limited liability company that conducts business in Missouri.

23. Plaintiff Moxie Services (Chicago), LLC is an Illinois limited liability company that conducts business in Chicago.

24. Plaintiff Moxie Services Minnesota, LLC is a Minnesota limited liability company that conducts business in Minnesota.

25. Plaintiff Moxie Pest Control (Arizona), LLC is an Arizona limited liability company that conducts business in Arizona.

26. Plaintiff Moxie Pest Control (Philadelphia), LLC is a Pennsylvania limited liability company that conducts business in Pennsylvania.

27. Plaintiff Moxie Pest Control (Tennessee), LLC is a Tennessee limited liability company that conducts business in Tennessee.

28. Plaintiff Moxie Pest Control (Raleigh), LLC is a North Carolina limited liability company that conducts business in North Carolina.

29. Plaintiff Moxie Pest Control (Orange County), L.P. ("Moxie Orange County") is a California limited partnership that conducts business in California.

30. Plaintiff Moxie Pest Control (Oklahoma), LLC is an Oklahoma limited liability company that conducts business in Oklahoma.

31. Plaintiff Moxie Pest Control – Denver, LLC is a Colorado limited liability company that conducts business in Colorado.

32. Plaintiff Mission Pest Control, L.P. is a California limited partnership that conducts business in California.

33. Plaintiff Moxie Pest Control (Tucson), LLC is an Arizona limited liability company that conducts business in Arizona.

34. Plaintiff Joshua's Pest Control, L.P. is a California limited partnership that conducts business in California.

35. Walton Holdings GP, LLC owns a controlling interest in each Plaintiff listed in paragraphs 13-33, above. Each of the entities listed in paragraphs 13-34, above, may be individually referred to herein as a "Moxie Affiliate" or "Plaintiff" and collectively referred to as the "Moxie Affiliates" or "Plaintiffs."

36. Nielsen is a natural person who upon information and belief is domiciled in and resides in Utah County, Utah. Nielsen is one of three Presidents of Sales at Aptive and initiated and conducted the wrongful actions alleged below. Nielsen is a senior executive at Aptive and Aptive's agent, authorized to act for and on behalf of Aptive.

37. Ruggio is a natural person who upon information and belief is domiciled in and resides in Utah County, Utah. At all times material, Ruggio was an owner of Aptive, was a Senior Vice President, and/or President of Sales at Aptive and initiated and conducted the wrongful actions alleged below. At all times material, Ruggio was Aptive's agent, authorized to act for and on behalf of Aptive.

38. Moser is a natural person who upon information and belief is domiciled in and resides in Utah County, Utah. Moser is a Senior Regional Manager at Aptive and participated directly in the wrongful actions alleged below. At all times material, Moser was Aptive's agent, authorized to act for and on behalf of Aptive.

39. Smith is a natural person who upon information and belief presently resides in Celina, Texas. During the relevant time period, Smith resided in Utah County, Utah. Smith participated directly in wrongful actions alleged below.

40. Upon information and belief, Aptive is a Utah limited liability company with its principal place of business located in Provo, Utah. Aptive initiated, conducted, authorized, ratified, and directly benefitted and profited from the wrongful actions alleged below. Aptive has operations in over 25 states and competes with the Moxie Affiliates to recruit and hire sales representatives.

41. Defendants, DOES 1 through 10, on information and belief, are associates of the other named Defendants who participated in the wrongful action alleged below, and who may be later specifically identified as parties in this action. Nielsen, Ruggio, Aptive, Moser, Smith, and DOES 1-10 may be referred to herein individually as "Defendant" or collectively as "Defendants."

## JURISDICTION AND VENUE

42. Plaintiffs seek redress for Defendants' violations of the Defend Trade Secrets Act ("DTSA") (18 U.S.C. § 1836), the Utah Uniform Trade Secrets Act ("UTSA") (Utah Code Ann. §§ 13-24-1 *et seq.*), and the Computer Fraud and Abuse Act (the "CFAA") (18 U.S.C. § 1030).

43. Accordingly, this Court has original subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) in connection with Plaintiffs' CFAA and DTSA claims. Furthermore, this Court has jurisdiction over Plaintiffs' Utah Uniform Trade Secrets Act claim under 28 U.S.C. § 1367 (supplemental jurisdiction) because Plaintiffs' state law claim is so related to Plaintiffs' federal question claims that it forms part of the same case or controversy.

44. This Court has personal jurisdiction over each Defendant. Plaintiffs are informed and believe that Nielsen, Ruggio, and Moser all reside in Utah, and Aptive is a Utah company with its principal place of business in Utah. Moreover, Defendants' wrongful acts occurred in, were targeted to, and caused damage in this judicial district. Personal jurisdiction over all Defendants also exists under 18 U.S.C. § 1965(b).

45. Venue properly lies in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred within this District, and under 18 U.S.C. § 1965(a).

## GENERAL ALLEGATIONS

***The Moxie Affiliates' Business***

46. In or about 2001, Jason Walton ("Walton") founded what eventually became the first "Moxie" pest control service company. Over the next 21 years, he and his partners and associates successfully expanded throughout the United States. The Moxie Affiliates now provide pest control products and services to over 250,000 residential and commercial customers in 20 states.

47. The Moxie Affiliates primarily use door-to-door sales representatives to market their products and services, typically during the summer months. To build teams of door-to-door sales representatives, the Moxie Affiliates contract with "Sales Companies." These Sales

Companies then recruit and contract with additional other sales representatives to market the Moxie Affiliates' pest control products and services.

48. The recruitment of sales representatives is essential to the Moxie Affiliates' business. And Moxie Affiliates compete aggressively with other summer sales pest control companies like Aptive for the recruitment of such sales representatives. While the Moxie Affiliates provide pest control services all year, they primarily operate their door-to-door sales programs from April through August each year. In the six months preceding April (from about October to March), Moxie Affiliates and the Sales Companies expend significant resources and efforts on recruiting sales representatives for the Moxie Affiliates' door-to-door sales programs to sell pest control products and services.

49. Much of this recruitment is amongst college-aged adults seeking summer employment, a large part of which occurs in the Provo, Utah area.

50. To organize and facilitate their sales programs, the Moxie Affiliates subscribe to a software platform called "PestRoutes." PestRoutes is owned and offered by a third- party company. The PestRoutes software is a relationship management technology that enables the Moxie Affiliates to manage their relationships and interactions with both customers and sales representatives.

51. SalesRoutes is an application within the PestRoutes platform that enables the Moxie Affiliates to manage their relationships with sales representatives. Importantly, the Moxie Affiliates also use SalesRoutes to manage and track sales representatives' performance.

52. The Moxie Affiliates use the SalesRoutes platform to store and display sales performance-related information. This includes a full compilation of the identities of sales representatives, the number of sales made by each sales representative, the total sales revenue per sales representative, each sales representative's average contract value sold, and other performance-related metrics. In other words, Moxie Affiliates store critical data regarding its business—a competitively sensitive compilation of information regarding their most important asset—within the SalesRoutes application. This is precisely the data that Defendants wanted to steal.

53. The SalesRoutes platform allows the Moxie Affiliates to sort and filter sales performance-related information. Among other competitively valuable functionality, SalesRoutes offers a feature called "Leaderboard," which allows the Moxie Affiliates to visualize sales representative performance in a variety of customizable ways. For example, Leaderboard can be customized to show the performance of just the leaders of a sales team in Dallas, Texas, the full sales team in Dallas, or an individual sales representative in Dallas during a particular sales season. A Leaderboard can also be customized to show the leaders across a select set or all of the Moxie Affiliates for a specified period of time. Importantly, the Leaderboard also can show the data for the complete, top-to-bottom list of *all* Moxie

Affiliates' sales representatives nationwide.

54. The Moxie Affiliates guard their SalesRoutes information carefully. All Moxie Affiliates are centrally controlled, and each Moxie Affiliate shares access to their specific SalesRoutes information with other Moxie Affiliates only on the strict condition that such information will be used only for business purposes and is protected as confidential information. Further, each Moxie Affiliate requires its Sales Companies and sales representatives to enter into confidentiality agreements. These agreements prohibit all sales representatives from using or disclosing any Moxie confidential information—including Moxie's SalesRoutes data—for any purpose other than in furtherance of the Moxie Affiliates' business. Further, the Moxie Affiliates' SalesRoutes information is protected by a technological gate: no person can access this information unless he or she has first obtained login credentials (username and password) from a Moxie Affiliate.

55. A sales representative's access is predicated on the sales representative's agreement that access to such information is for a proper purpose and not disclosed to any third party outside of a proper purpose.

56. The Moxie Affiliates' SalesRoutes information—specifically, Leaderboards that compile the identities of all Moxie Affiliate sales representatives and each sales representative's performance metrics for an entire year (or year-to-date)—is not available to the public or ascertainable to the public. That unique and complete compilation of information cannot be found in any public source. Such information is confidential, proprietary and a trade secret. This information is highly sensitive business information.

Disclosure of this information—especially to a direct competitor--would diminish its value and could be used to significantly thwart, and compete against, the Moxie Affiliates and Sales Companies' efforts to recruit sales representatives, sell products and services offered by Moxie Affiliates to new customers and maintain their current businesses. As Defendant Ruggio put it, obtaining that data was a critical component of Defendants' plan to "squash moxie."

***Aptive's Business and Organization***

57. Aptive was founded in 2015 by David Royce ("Royce") and Vess Pearson ("Pearson"). Presently, Pearson is Aptive's CEO.

58. Long before Aptive was founded, Walton gave Aptive's founders—Royce and Pearson—their start in the pest control industry. Royce began as a Moxie door-to-door sales representative in the early 2000's. With support from Walton, he then operated a Moxie company in Southern California. Pearson and Nielsen met Royce there. When Royce sold his Moxie interest in 2008 and then started another pest control company named EcoFirst, Nielsen and Pearson went with him. Once Royce established EcoFirst, EcoFirst sold its customer accounts. Royce then started a company called "Alterra," which also sold pest control, and which eventually became Aptive. Nielsen followed Royce and Pearson from EcoFirst to Alterra to Aptive.

59. Aptive sells pest control services throughout multiple states in the United States and recruits and deploys sales representatives throughout the United States. Aptive's door-to-door sales program and pest control services are in, and affect, interstate commerce.

60. In 2019, Aptive reported $206.7 million in revenue. In 2020, Aptive reported $268 million. In 2021, Aptive's estimated annual revenue was $477 million. Aptive's stated goal is to reach $1 billion in revenue by 2025.

61. At Aptive, as is typical in the industry, sales representatives generally earn a commission on each account successfully sold. If a sales representative recruits and leads other sales representatives, he or she can also earn a commission or override on each sale made by a sales representative in his or her sales network. Typically, a sales network is not limited to sales representatives directly recruited by the leader of the sales network; if such a recruit himself recruits other sales representatives, those representatives are typically part of the original representative's growing network. Thus, market dynamics create powerful financial incentives for sales executives and representatives to outcompete other door-to- door sales companies for talented recruits to add to their sales networks.

62. Aptive enhances that incentive to compete for sales representatives through a long-term incentive plan ("LTIP") that awards "points" to sales representatives based on the number of successful sales made by their respective sales networks during a selling season. As someone's LTIP point total grows, so too does his or her payout in the event of a qualifying transaction, such as a sale of Aptive.

63. Plaintiffs are informed and believe that Nielsen recruited Ruggio to his sales network while selling for a prior pest control company, and that Ruggio remained in Nielsen's sales network when both followed Royce to Aptive. Plaintiffs are informed and believe that Moser and Smith all joined Ruggio's—and, hence, Nielsen's—sales network as

well.

64. At Aptive, from 2016 to 2020, Ruggio was in Nielsen's sales network, and every sales representative in Ruggio's sales network was also in Nielsen's sales network. From 2016 to 2020, Moser was in Ruggio's sales network, and ultimately was in Nielsen's sales network. From 2017 to 2020, Smith was in Ruggio's sales network, and ultimately was in Nielsen's sales network.

65. Aptive keeps detailed, real-time sales performance data regarding each of its sales representatives, and it keeps that data in a database accessible by username and password. Defendants knew that Aptive's key competitors, such as the Moxie Affiliates and other summer pest control companies, also kept detailed compilations of their sales representatives' performance.

66. Defendants devised and carried out a long-running scheme to steal and misappropriate the Moxie Affiliates' (and other competitors') confidential, proprietary and trade secret data, so that Defendants could use that information to steal recruits from Aptive's competitors, and to dissuade potential recruits from working for Aptive's competitors, including the Moxie Affiliates. For example, Ruggio explained Defendants wanted the full compilation (the "entire database," as Ruggio would say) of their competitors' "raw data" so that Defendants could manipulate and use that proprietary information however they wished *against* the same competitors in meetings with potential recruits.

67. Defendants knew, however, that a full or comprehensive compilation of the

Moxie Affiliates' "raw data" regarding sales representatives' performance could not be found publicly, but rather was proprietary to the Moxie Affiliates. Defendants therefore devised a scheme to first steal and misappropriate the data through bribes and other means, and second, to use the stolen data to dissuade potential recruits from working for Aptive's competitors and persuade potential recruits to work for Aptive.

68. In thousands of meetings with thousands of potential recruits, Defendants used stolen and misappropriated proprietary data to recruit sales representatives to Aptive and poison those same representatives against Aptive competitors, including the Moxie Affiliates. For example, Defendants would tell potential recruits that they had their competitors' entire databases and could therefore objectively prove to them that they would sell more working for Aptive than they would working for a Moxie affiliate. However, the Defendants would conveniently omit that the "objective" data was stolen and also mischaracterized.

***The Illicit Acquisition and Uses of the Moxie Affiliates' 2019 Sales Routes Information***

69. On June 6, 2019, while a Senior Vice President of Aptive, Ruggio sent out a request to a group of Aptive sales leaders he called the "Dream Team" to misappropriate the internal sales representative performance data of the Moxie Affiliates and other competitors so that they could "squash moxie [*sic*] and continue to combat Greenix and Hawx." Ruggio's message stated as follows:

To: Dream Team

Jun 6, 2019, 4:45 PM

[redacted]-9673

We need to prepare now to squash moxie and continue to combat Greenix and Hawx. The best way to do that is by obtaining screenshots that tell the truth about how many reps they send out. Historically I've gone about obtaining this on my own but if we want to collectively obtain evidence and proof I'm willing to share e everything we find this year.

70. Upon information and belief, Nielsen, Moser, and Smith were also members of the Dream Team.

71. To further Ruggio's directive to the Dream Team to obtain screenshots, in or about August 2019, Ruggio and Smith coordinated to acquire screenshots of the Moxie Affiliates' sales information for the 2019 summer sales season. Specifically, Ruggio offered to pay Brandon Najera ("Najera")—a former Aptive sales representative who was selling Moxie services in the Washington, D.C. area for the summer 2019 sales season—and Smith $100 each to acquire this information, intending to convert the information to the economic benefit of persons other than Plaintiffs, and intending and knowing that this scheme would injure Plaintiffs. Ruggio and Smith knew that because Najera was selling for a Moxie Affiliate for the 2019 summer season, Najera had log-in credentials for the Moxie Affiliates' SalesRoutes platform, and therefore could access the Moxie Affiliates' Leaderboard information for all the Moxie Affiliates' sales representatives' performance, top to bottom (the "2019 Moxie Leaderboards"). As explained by Smith, Ruggio wanted to have "that power of information" to increase recruiting of sales representatives to Aptive.

72. At the time, Smith was selling for Aptive in the San Francisco Bay area, while,

as mentioned, Najera was selling for Moxie in the Washington, D.C. area. Plaintiffs are informed and believe that, by interstate wire, in or around September 2019, Smith asked Najera to obtain the 2019 Moxie Leaderboards for a $100 payment.

73. Plaintiffs are informed and believe that, in or about September 2019, Najera used his Moxie-provided SalesRoutes log-in credentials to access the 2019 Moxie Leaderboards so that he could transmit the 2019 Moxie Leaderboards to Smith. By doing so, he violated his contractual agreement to keep the Moxie SalesRoutes information confidential and to use it only for the Moxie Affiliates' business purposes. He also violated his duty to disclose to the Moxie Affiliate for which he was providing sales services that he was going to use his log-in credentials to help a competitor, Aptive, misappropriate the 2019 Moxie Leaderboards (something he had no right to do). Najera did not disclose this material information to Moxie, but instead concealed it. Najera used the wires to access the 2019 Moxie Leaderboards as described above on the false pretense that he was conducting and furthering Moxie business, when in fact he was doing *precisely the opposite* by accessing that data at the request of Ruggio and Smith. Had the Moxie Affiliate for which Najera was providing services (or any of the other Moxie Affiliates) known that Najera was accessing the 2019 Moxie Leaderboards subsequent to Ruggio's offer of a bribe, the Moxie Affiliate would have immediately terminated Najera's log-in credentials.

74. On or about September 17, 2019, Najera took screen recording as he scrolled through the 2019 Moxie Leaderboards. Using interstate wire transmission, Najera transmitted the screen recording to Smith, which Smith knowingly received and possessed.

75. Upon information and belief, Ruggio, through Aptive, paid Smith and Najera for acquiring the 2019 Moxie Leaderboards.

76. After Smith delivered Najera’s video to Ruggio, Smith was directed by Ruggio and Pearson (Aptive’s CEO) to request that Najera send clearer images (screenshots) of the 2019 Moxie Leaderboards.




77. The 2019 Moxie Leaderboards were a compiled report that showed the names of approximately 550 Moxie Affiliate sales representatives for the 2019 season, the Moxie

Affiliate to which each sales representative was assigned, the number of accounts that each representative sold, the number of accounts that each representative sold that were subsequently serviced, and each sales representative's average contract value. When Najera transmitted the screenshots of the 2019 Moxie Leaderboards, it included the Leaderboard information for the sales representatives ranked 1 through 38 and 49 through 562. Plaintiffs are informed and believe, and on that basis allege, that Najera inadvertently missed the sales representatives ranked 39 through 48 when he took the screenshots or when he transmitted the screenshots to Smith.

78. On September 17, 2019, Ruggio asked Smith to send him a copy of what Smith had acquired from Najera so that Ruggio could put an analysis of that data into a spreadsheet. Ruggio wrote:




Smith transmitted, communicated, and conveyed the requested information to Ruggio.

79. Upon information and belief, Smith also transmitted, communicated, and conveyed the 2019 Moxie Leaderboards to Nielsen, who was then an Aptive Senior Vice President. On November 27, 2019, Nielsen asked Smith if he ever found "that missing screenshot from moxie" (i.e., the screenshot for the sales representatives ranked 39 through 48). Nielsen asked, "Any way to get it?" Smith replied, "I just texted my Moxie reps to see if they can log in." Plaintiffs are informed and believe that the only reason Nielsen wanted the

"missing screenshot from moxie" was because Nielsen was using the 2019 Moxie Leaderboards to recruit sales representatives to Aptive and his sales network.




80. That same day, Smith sent a text message to Najera asking him if there was any way he could "still log into the Moxie database." The Moxie Affiliates, however, restrict sales representatives' access to the Moxie Affiliates' proprietary SalesRoutes account and data after the sales representative no longer has any legitimate need for that information. By November 27, 2019, Najera's relationship as a sales representative selling Moxie services had ended. On information and belief, on or about November 27, 2019, Najera tried to once again access the Moxie SalesRoutes account by use of interstate wire transmission in orderto

further exfiltrate and purloin data from the 2019 Moxie Leaderboards. Indeed, when Smith asked if Najera could still log into the Moxie database, Najera replied, "I tried checking it but it looks like it's not working."

81. Upon information and belief, Smith also shared the 2019 Moxie Leaderboards with Moser. Moser confessed in a text message that he subsequently got scared and deleted them. Moser wrote: "I'm pissed I deleted all my stuff. . . I got scared when I had my computer taken by the FBI to make a copy of it because of Kyle [Nielsen] lol."




82. Upon information and belief, in addition to Ruggio and Moser, Smith transmitted the 2019 Moxie Leaderboards to many other persons in the Nielsen and/or Ruggio sales networks, including David Scott Warner ("Warner"). In the same text conversation in which Moser told Warner that he regretted deleting the 2019 Moxie Leaderboards, Warner stated, "I still have moxie [*sic*] 2019 screenshots lol."

83. Defendants used the 2019 Moxie Leaderboards to compete unlawfully and unfairly against the Moxie Affiliates in the recruitment of sales representatives. In order to poison the well of recruits available to the Moxie Affiliates, Defendants disclosed the 2019 Moxie Leaderboards and/or purported summaries to many individuals who had no relationship to/with any of the Moxie Affiliates.

84. For example, by use of interstate wire transmission, Ruggio transmitted and communicated a summary analysis of the 2019 Moxie Leaderboards (the "Ruggio 2019 Moxie Summary") to the entire "Dream Team" and encouraged them to "skewer" Moxie. The summary purported to set forth the percentage of Moxie sales representatives who had sold more than 400 accounts, more than 300 accounts, more than 200 accounts, etc. Ruggio could not have compiled that summary from information available to the general public; he had to have the 2019 Moxie Leaderboards misappropriated from, and obtained by artifice, fraud and deception from, the Moxie SalesRoutes account. Upon information and belief, Ruggio also used the misappropriated 2019 Moxie Leaderboards to dissuade individuals that were not related to any Moxie Affiliate from ever working with any Moxie Affiliate.

85. Smith himself used the information he received from Najera to recruit sales representatives for himself and his Aptive sales network. Smith created what purported to be a statistical analysis of the 2019 Moxie Leaderboards called "Aptive vs. Moxie Comparison." Smith's analysis purported to show that Aptive reps sell more accounts than Moxie reps. Smith could not have compiled that statistical analysis from information available to the general public.

86. On February 11, 2020, Smith used interstate wires to send the following message to a potential Aptive recruit who, upon information and belief, had no relationship to a Moxie Affiliate:

> R
>
> Ryan Smith Feb 11, 2020
>
> to [redacted]
>
> Dallin,
>
> I emailed you a link from Tiled that you should check out- it has valuable info about us and our past summer as well. I'm not sure how familiar you are with our competitors in the industry, but Moxie is another door-to-door pest company based up here in Utah. Here are screenshots from both company databases (Moxie & Aptive) after summer 2019. I've sorted them based on percentile to draw a fair comparison between different tiers of performance within each organization. A common fallacy in the industry is that the company you sell for doesn't influence your success or your earnings. In fact quite the opposite is true- everything depends on quality of leadership and training.
>
> Let me know what you think and let's talk again soon.
>
> Cheers,
>
> Ryan Smith

Plaintiffs are informed and believe, and thereon allege, that Smith transmitted and conveyed to that recruit—via interstate wires—trade secret information obtained from the 2019 Moxie Leaderboards that Smith knew had been obtained by fraud, artifice, and deception and without authorization. Smith disclosed this information to dissuade this individual—an

individual who had no previous relationship with a Moxie Affiliate—from considering working for Aptive's competition, or a Moxie Affiliate.

87. Like Smith and Ruggio, Moser also used the 2019 Moxie Leaderboards to recruit sales representatives and poison the Moxie Affiliates' recruiting well. For example, in October or November of 2020, Bryant McArthur ("McArthur"), who contracts as a sales representative with Moxie Dallas, met with Moser in Orem, Utah. Upon learning that McArthur had previously worked for a Moxie Affiliate, Moser showed McArthur the misappropriated 2019 Moxie Leaderboards.

88. Moser asked McArthur who his team leader was at Moxie Dallas, and then pulled up, from the misappropriated data, McArthur's team leader's performance numbers, including the number of serviced contracts his team leader had sold, in an effort to convince McArthur to sell for Aptive rather than a competitor such as a Moxie Affiliate. Moser knew the information had been obtained, appropriated, and carried away without authorization and by fraud, artifice, and deception. Upon information and belief, Moser disclosed the 2019 Moxie Leaderboards to a large number of potential recruits—recruits who had no previous relationship with a Moxie Affiliate—to dissuade them from ever considering working with a Moxie Affiliate.

89. In addition to sharing his summary of the 2019 Moxie Leaderboards with the Dream Team, Ruggio used the 2019 Moxie Leaderboards in his own personal one-on-one recruiting meetings, knowing that the information had been obtained, appropriated, and carried away without authorization and by fraud, artifice, and deception.

90. For example, on March 10, 2020, Ruggio met with Hayden Clifford ("Clifford"), a sales representative who was signed with Moxie Orange County for the 2020 summer selling season.

91. Aptive paid Clifford $100 to come and meet with Ruggio in an effort to dissuade Clifford from selling for Moxie Orange County and to provide services for Aptive instead.

92. Ruggio told Clifford that he likes to base his decisions on raw data, and that Clifford too should base his decision (the decision of whether to work for a Moxie Affiliate) on raw data.

93. Ruggio then asked Clifford whether he had ever seen the Moxie Affiliates' raw data. Ruggio told Clifford that he had collected the Moxie Affiliates' data and proceeded to pull up screenshots of 2019 Moxie Leaderboards on his computer. Ruggio explained how he had crunched such data to first determine the total number of sales representatives that had worked for the Moxie Affiliates in 2019. With this, Ruggio attempted to persuade Clifford that, historically, most of the Moxie Affiliates' sales representatives did not sell the number of accounts Clifford hoped to sell. Using the Moxie Affiliates' data, Ruggio attempted to persuade Clifford that it was improbable he would meet his goals working for a Moxie Affiliate. Upon information and belief, Ruggio disclosed the 2019 Moxie Leaderboards to a large number of potential recruits—recruits who had no previous relationship with a Moxie Affiliate—to dissuade them from ever considering working with a Moxie Affiliate.

94. Upon information and belief, other Dream Team members received 2019

Moxie Leaderboards and used them to recruit sales representatives to Aptive and to poison the Moxie Affiliates' pool of potential recruits in the same way that Ruggio, Moser, and Smith did.

***The Illicit Acquisition and Use of Moxie Affiliates' 2020 Sales Routes Information***

95. Defendants also wanted to obtain the Moxie Affiliates' SalesRoutes information for the 2020 selling season, knowing full well such a compilation of data could only be obtained by illicit access to the Moxie password-protected SalesRoutes account.

96. Ruggio promoted this scheme by offering anyone $1,000 who obtained screenshots of a competitor's sales information.

97. On July 30, 2020, Warner, who was in Ruggio and Moser's sales network, sent a text message to two persons, asking: "What are the chances you guys can get all of moxies [*sic*] numbers from someone?" One of the recipients responded, "I have a couple guys I could ask. I've been chatting with him since I met him in AZ. I have two of the VPs numbers but doubt they will share[.]" Warner replied, "Yah [*sic*] definitely not them, needs to be a lower level person most likely."




98. On August 12, 2020, Warner continued probing, by use of interstate wire transmission, for someone willing to steal the Moxie 2020 SalesRoutes information. That day, he sent a message to "Ryan" asking, "Do you think your people at moxie [*sic*] would give you a video of all the people on team? Or the company?" Ryan responded, "I'm going to try ! It'll be tough though[.] I was going to try to get screenshots." Warner replied, "Donnie [Moser] will give you 1000$ if you get a video of their database[.]"




WARNER_005

99. On October 10, 2020, Michael Eddington, an Aptive sales leader, sent a message to the *Sales Regionals group messaging thread, “Who has Moxie database they can send me?” Ruggio responded: “Let’s get data on them for this year. I’ll pay any of you $1000 to help get it.” On information and belief, this message to the *Sales Regionals group used the interstate wires.



100. On November 16, 2020, Warner asked a third-party named "Anica," who was not an Aptive employee or representative, to misappropriate sales information "from fox and moxie." (Fox Pest Control is another one of Aptive's competitors.) Warner exchanged the following messages with Anica (Warner's messages are in blue):




101. Defendants ultimately obtained access to the Moxie Affiliates' 2020 SalesRoutes information through Cayden Johnson ("Johnson").

102. In October 2020, Nielsen and Johnson met at Aptive's headquarters. Johnson was not an Aptive employee or representative.

103. At that meeting, Nielsen told Johnson that he would pay Johnson a bribe in exchange for access to Moxie proprietary and confidential sales information.

104. In or around December 2020, to carry through on Nielsen's request, Johnson

used the interstate wires to enter into a confidentiality agreement with Moxie Utah. Johnson falsely promised to Moxie Utah that he would maintain the confidentiality of Moxie business data, which included the SalesRoutes information, when in fact Johnson intended to provide Moxie's proprietary and confidential sales information to Nielsen. Additionally, despite a duty to do so, Johnson concealed and did not disclose that he had been bribed by Nielsen to obtain access to the SalesRoutes information for use against the Moxie Affiliates. At Johnson's request and so that Johnson could purportedly conduct pre-season sales, Moxie Utah provided SalesRoutes login credentials to Johnson on January 11, 2021. Had Moxie Utah known of Nielsen's offer to pay Johnson for access to Moxie sales performance data, Moxie Utah would not have provided the SalesRoutes log-in credentials to Johnson.

105. On the very same day that Johnson received his SalesRoutes access credentials, Johnson went to Aptive's headquarters in Provo, Utah to meet with Nielsen, Aptive's President of Sales. There, Johnson gave his Moxie SalesRoutes log-in credentials to Nielsen.

106. As compensation for giving him the log-in credentials, Nielsen paid Johnson $2,000 via Venmo/interstate wire transmission, and also gave him a pair of collector Nike sneakers. As intended by Nielsen, this payment compensated Johnson for depriving Plaintiffs of their property, and for depriving Moxie Utah of Johnson's honest services. The payment also secured Johnson's concealment of their actions. During the relevant time period, Johnson was under a contractual duty of confidentiality, and Nielsen knew this.

107. In January 2021, after thus obtaining the access credentials, Nielsen repeatedly

accessed, via interstate wire transmission, the Moxie Affiliates' confidential and proprietary information under false pretenses. By using Johnson's credentials, Nielsen falsely represented that he was Johnson and/or that that he had authorization from Moxie Utah to access the Plaintiffs' information. Nielsen intentionally and deliberately concealed from Plaintiffs, and did not disclose to them, that he accessed and took screenshots of their information and that he did so for the purpose of competing against them.

108. In January 2021, under the false pretense that he was Johnson, Nielsen logged into SalesRoutes multiple times for multiple hours.

109. While he was logged into SalesRoutes, and without the Moxie Affiliates' consent, Nielsen took screenshots and a lengthy video screen recording of the Moxie Affiliates' information, intending to convert that information to the economic benefit of persons other than Plaintiffs, intending and knowing his actions would injure Plaintiffs, and knowing that he was stealing and obtaining the information by fraud, artifice, deception, and without authorization.

110. Among other things, Nielsen obtained a screen recording of his accessing and browsing through the 2020 Moxie SalesRoutes information.

111. Nielsen's screen recording captured the Moxie Affiliates' proprietary information, which included the identities of 1,024 sales representatives, the name of the Moxie Affiliate to which each sales representative was assigned, the number of accounts that each representative sold, the number of accounts that each representative sold that were subsequently serviced, and each sales representative's average contract value (the "2020

Moxie Leaderboards”).

112. Shortly after he obtained the 2020 Moxie Leaderboards, Nielsen distributed them to Ruggio and Moser.

113. On or about January 12, 2021, just a day after Nielsen obtained the log-in credentials from Cayden Johnson and had personally used them to log in, a representative of one of the Moxie Affiliates heard that Aptive was somehow accessing Moxie’s SalesRoutes data, and sent a text message to Nielsen stating, “I hear you guys are looking at our sales routes numbers.” Nielsen falsely replied, “Not that I’ve heard” and “Can you be more specific so I can look into it?” These statements were intentionally false and misleading, as Nielsen knew at the time that he himself had been personally using Johnson’s log-in credentials to look at the 2020 Moxie Leaderboards in SalesRoutes. Nielsen concealed that he himself was looking at and copying the 2020 Moxie Leaderboards, and that he was the source of the unauthorized disclosure. The Moxie Affiliates are informed and believe that Nielsen sent these intentionally misleading lulling communications, and both concealed and did not disclose the true facts, because he knew he had no right to be accessing, rummaging through, and screen recording the Moxie SalesRoutes information with log-in credentials he had paid Cayden Johnson to obtain and provide to him for that illicit purpose.

114. Nielsen further concealed his actions when he told Johnson to destroy evidence of their interactions, including deleting any and all text messages between the two of them. Johnson followed Nielsen’s instructions and destroyed evidence of their communications on his mobile phone.

115. After receiving the 2020 Moxie Leaderboards from Nielsen, Ruggio and Moser distributed, transmitted, and communicated summaries of the information throughout the Aptive organization (including to Aptive CEO Vess Pearson) and encouraged Aptive sales leaders to use this information to recruit sales representatives, including sales representatives who had no prior affiliation with any Moxie Affiliate. Upon information and belief, this distribution, transmission, and communication took place by use of interstate wire transmission.

116. Ruggio sent a message, via interstate wire transmission, to Aptive's CEO Vess Pearson and 46 other sales leaders in a thread labeled "#general." Ruggio complimented Nielsen for stealing the Moxie Affiliates' information, stating "Shoutout to @Kyle Nielsen for getting the data." Ruggio then purported to summarize various data points he obtained from the 2020 Moxie Leaderboards (the "Ruggio 2020 Moxie Summary"), and then instructed, "Use that in your battles," including battles to dissuade recruits from joining a Moxie Affiliate and to persuade recruits to join Aptive, without regard to whether recruits had a previous relationship with a Moxie Affiliate.

117. Moser used the 2020 Moxie Leaderboards in many of his recruiting meetings. While meeting with potential recruits, including recruits with no prior affiliation with a Moxie Affiliate, Moser would compare Aptive's sales numbers to Moxie's and say, "at Moxie, this is what you sell, over here. At Aptive, this is what they sell, over here. Let's plug it in. You'll make more money at Aptive. You should sell here."

118. For example, in March 2021, Moser used 2020 Moxie Leaderboards to

successfully recruit Zak Benson, an individual with no prior relationship with a Moxie Affiliate. In recruiting Benson, Moser showed Benson the 2020 Moxie Leaderboards. Plaintiffs are informed and believe, and thereon allege that, at that time Zak Benson was considering selling for a Moxie Affiliate, but subsequent to Moser using the 2020 Moxie Leaderboards to recruit Benson, Benson decided to sell for Aptive.

119. As another example, Blake Rogers ("Rogers"), a team leader for Aptive in 2020 and 2021, texted Moser asking if Moser had access to the Moxie Affiliates' sales performance numbers. Moser confirmed and agreed to accompany Rogers to a meeting with a potential recruit who was also considering selling for Moxie.

120. Aptive regional leaders with sales networks independent of Nielsen, Ruggio, and Moser's also used the 2020 Moxie Leaderboards to recruit sales representatives to Aptive and dissuade potential recruits, including those with no prior relationship with a Moxie Affiliate, from working with a Moxie Affiliate.

121. On or around January 27, 2021, an Aptive representative named Mason Mckay Childs ("Childs") attempted to recruit a Moxie Maryland representative named Charlie Stone ("Stone").

122. In attempting to recruit Stone, Childs told Stone that he had seen "moxie's numbers" and that they were from "the data base." Childs told Stone according to the numbers he had seen, a certain percentage of sales representatives did not reach 100 sales.

Childs told Stone that that "I was just told like [X]%[1] didn't break 100 sales." Childs told Stone that "we" compared Moxie's numbers "side by side to just Darren's region," and that the numbers indicated Aptive had been more successful than Moxie. Childs repeated the Ruggio 2020 Moxie Summary and told Stone that there were X number of Moxie reps with at least one sale, Y number of reps with over 400 sales, and Z number of reps with over 250 sales.

123. On February 18, 2021, Keaton Whitney ("Whitney"), an Aptive representative, attempted to recruit Kohrman Osenbach by transmitting to him the Ruggio 2020 Moxie Summary.

124. In January 2021, Garret Myers, an Aptive sales leader, attempted to recruit Robby Brown by transmitting to him the Ruggio 2020 Moxie Summary. Upon information and belief, Robby Brown had no previous affiliation with a Moxie Affiliate.

***Defendants' Acquisition and Use of Other Competitors' Information***

125. As referenced above, Defendants have illegally acquired and/or used, and have sought to acquire, the sales information of other competitors besides the Moxie Affiliates.

126. In planning with the Dream Team to "squash" Moxie, Ruggio also discussed plans to "combat" two other Aptive competitors.

127. In his March 2020 meeting with Clifford, Ruggio told Clifford that he had also

[1] Specific values are omitted in this document to preserve confidentiality.

obtained raw data from Hawx and Greenix. Ruggio knew the number of accounts sold by Hawx's median sales representative and told Clifford he had seen Hawx data with his own eyes.

128. Ruggio said that he actually had Greenix's entire database, and that he takes it upon himself to get the database of every single company.

129. On two separate occasions, Moser paid persons at least $1,000 each to acquire sales information from Aptive competitors other than Moxie. In August 2020, Moser paid an Aptive sales representative named Tessa at least $1,000 to obtain screenshots of Greenix, a competitor's, sales information. That same year, Moser paid an Aptive sales representative named Nick at least $1,000 to obtain the internal sales information of another competitor, Brooks. Moser directed Aptive to pay both Tessa and Nick out of his marketing deal, by submitting a bonus request to Aptive, to which Aptive responded by issuing payment to Tessa and Nick.

130. On April 19, 2022, Smith testified that it is common at Aptive to conspire with a competitor's sales representative "to download or record or document a competitor's top-to-bottom leaderboard" and that "Moxie's sales data wasn't the only one being shared."

***The Defendants Have Been Enriched as a Result of Their Conduct***

131. In or about August 2020, Aptive promoted Nielsen to become one of four Presidents of Sales at Aptive. In or about August 2020, Aptive promoted Ruggio to become one of four Presidents of Sales at Aptive. Aptive promoted Moser Division Manager in 2017, Regional Manager in 2019, and Senior Regional Manager in 2020. Aptive promoted

Nielsen, Ruggio, and Moser because of their success at recruiting sales representatives.

132. From 2016 to 2020, Nielsen's sales network, including Ruggio's, grew from approximately 200 to 600 sales representatives. From 2016 to 2021, through his recruiting efforts and tactics, Moser's sales network grew from 4 teams and 50-70 sales representatives to 10 teams and more than 190 sales representatives.

133. Aptive's growth and the Defendants' sales network's growth was driven by their recruiting tactics, which included a variety of illegal and criminal acts, as described herein.

***The Defendants' Conduct Has Harmed the Moxie Affiliates***

134. As a result of Defendants' actions, the Moxie Affiliates have suffered significant economic harm. The Defendants have diminished the economic value of the Moxie Affiliates' property—the 2019 and 2020 Moxie Leaderboards.

135. The Defendants have used the Moxie Affiliates' proprietary information to poach Moxie sales representatives, resulting in a loss of sales revenue to the Moxie Affiliates, , for which the Moxie Affiliates were damaged and are entitled to, at the very least, reasonable royalties. Aptive has identified several individuals who Aptive successfully recruited who were previously contracted with a Moxie Affiliate and listed on the 2019 or 2020 Moxie Leaderboards.

136. The Defendants have used the Moxie Affiliates' proprietary information to dissuade unaffiliated, undecided potential recruits from selling for the Moxie Affiliates, resulting in a loss of sales to the Moxie Affiliates, for which the Moxie Affiliates were damaged and are entitled to, at the very least, reasonable royalties. As described above, the

Defendants first did this by fraudulently representing to potential

recruits that they are credible because they have objective "raw data" (Moxie's database), while failing to disclose that they obtained this information illegally and have no legal right to possess or disclose it. Second, the Defendants then presented comparisons, which they could not create without the 2019 and 2020 Moxie Leaderboards, to purportedly and inaccurately illustrate that the recruit would be more successful selling for Aptive rather than a Moxie Affiliate.

137. Although the precise number of lost potential recruits—recruits with no prior affiliation with a Moxie Affiliate—to the Moxie Affiliates is unknown, it is substantial. From 2019 to 2021, during the recruiting season—a nine-month period from September to May, Moser [testified that] he himself met with 20 to 30 potential recruits per week, or approximately 180 to 270 potential recruits. Since Aptive's inception, Pearson engaged Aptive leaders in regular recruiting trainings, and Aptive leaders, including Nielsen, Ruggio, Moser, conduct their own training. Upon information and belief, Nielsen, Ruggio, and Moser taught other Aptive leaders and encouraged them to use the 2019 and 2020 Moxie Leaderboards and information derived therefrom to poison the Moxie Affiliates' recruiting pool.

138. By illegally obtaining and using the Moxie Affiliates' proprietary information to gain a competitive edge, the Defendants have caused the Moxie Affiliates to lose sales revenue and the Defendants have been unjustly enriched.

139. As a result of the Defendants' actions, the Moxie Affiliates have been and will continue to be injured in an amount to be established according to proof. Moreover, the

Moxie Affiliates have been and will continue to be injured absent equitable relief.

**FIRST CAUSE OF ACTION**
**(Violation of 18 U.S.C. § 1836 et seq. – Defend Trade Secrets Act – Against All Defendants)**

140. Plaintiffs hereby incorporate by reference the allegations set forth above as if fully set forth herein.

141. The Moxie Affiliates collectively own the 2019 and 2020 Moxie Leaderboards. Each Moxie Affiliate owns the sales performance information generated and input into SalesRoutes by sales representatives with whom each respective Moxie Affiliate has a contractual relationship.

142. The 2019 and 2020 Moxie Leaderboards are the Moxie Affiliates' trade secrets.

143. The 2019 and 2020 Moxie Leaderboards are compilations of the Moxie Affiliates' sales performance information, which is the Moxie Affiliates' financial, business, and economic information, that derives independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from the disclosure or use of the information.

144. The Moxie Affiliates have taken steps and made efforts that are reasonable under the circumstances to maintain the secrecy of their trade secrets by, among other things, predicating access and use of their trade secrets on written confidentiality agreements, restricting access to their trade secrets by purchasing and utilizing PestRoutes' technology,

and by prohibiting access to their trade secrets without valid login credentials.

145. The Defendants did not reverse engineer, independently derive, or acquire the 2019 and 2020 Moxie Leaderboards by any other lawful means of acquisition.

146. Defendants acquired the Moxie Affiliates' trade secrets with knowledge or reason to know that the trade secrets were acquired by improper means including theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.

147. Defendants disclosed and used the Moxie Affiliates' trade secrets without express or implied consent, knowing, at the time of their use and/or disclosure, that the Moxie Affiliates' trade secrets and their knowledge of the trade secrets were/was obtained using improper means.

148. Defendants disclosed and used the Moxie Affiliates' trade secrets without express or implied consent, knowing, at the time of their use and/or disclosure, that the Moxie Affiliates' trade secrets and their knowledge of the trade secrets were/was derived from or through a person who had utilized improper means to acquire it.

149. Defendants disclosed and used the Moxie Affiliates' trade secrets without express or implied consent, knowing, at the time of their use and/or disclosure, that the Moxie Affiliates' trade secrets and their knowledge of the trade secrets were/was derived from or through a person who owed a duty to the Moxie Affiliates' to maintain its secrecy or limit its use.

150. Defendants' actions have caused and will continue to cause damage to the

Moxie Affiliates and, unless restrained, will further damage the Moxie Affiliates, the nature and extent of which may not be able to be proved with certainty, irreparably injuring the Moxie Affiliates, leaving them without a remedy at law.

151. Plaintiffs are entitled to damages as a result of Defendants' misappropriation and/or violation of the Defend Trade Secrets Act.

152. Defendants' misappropriation of the Moxie Affiliates' trade secrets was willful and malicious, entitling Plaintiffs to exemplary and/or punitive damages, and attorneys' fees.

153. Preliminary and permanent injunctive relief is necessary to prevent irreparable harm and further disclosure of the Moxie Affiliates' trade secrets.

**SECOND CAUSE OF ACTION**
**(Violation of Utah Code Ann. §§ 13-24-1 et seq. – Uniform Trade Secrets Act – Against All Defendants)**

154. Plaintiffs hereby incorporate by reference the allegations set forth above as if fully set forth herein.

155. The 2019 and 2020 Moxie Leaderboards are the Moxie Affiliates' trade secrets.

156. The 2019 and 2020 Moxie Leaderboards are compilations of the Moxie Affiliates' sales performance information that derive independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

157. The Moxie Affiliates have taken steps and made efforts that are reasonable

under the circumstances to maintain the secrecy of their trade secrets by, among other things, predicating access and use of their trade secrets on written confidentiality agreements, restricting access to their trade secrets by purchasing and utilizing PestRoutes' technology, and by prohibiting access to their trade secrets without valid login credentials.

158. Defendants acquired the Moxie Affiliates' trade secrets with knowledge or reason to know that the trade secrets were acquired by improper means including theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.

159. Defendants disclosed and used the Moxie Affiliates' trade secrets without express or implied consent, knowing, at the time of their use and/or disclosure, that the Moxie Affiliates' trade secrets and their knowledge of the trade secrets were/was obtained using improper means.

160. Defendants disclosed and used the Moxie Affiliates' trade secrets without express or implied consent, knowing, at the time of their use and/or disclosure, that the Moxie Affiliates' trade secrets and their knowledge of the trade secrets were/was derived from or through a person who had utilized improper means to acquire it.

161. Defendants disclosed and used the Moxie Affiliates' trade secrets without express or implied consent, knowing, at the time of their use and/or disclosure, that the Moxie Affiliates' trade secrets and their knowledge of the trade secrets were/was derived from or through a person who owed a duty to the Moxie Affiliates' to maintain its secrecy or limit its use.

162. Defendants' actions have caused and will continue to cause damage to the Moxie Affiliates and, unless restrained, will further damage the Moxie Affiliates, the nature and extent of which may not be able to be proved with certainty, irreparably injuring the Moxie Affiliates, leaving them without a remedy at law.

163. Plaintiffs are entitled to damages as a result of Defendants' misappropriation of the Moxie Affiliates' trade secrets and/or violation of the Uniform Trade Secrets Act.

164. Defendants' misappropriation of the Moxie Affiliates' trade secrets was willful and malicious, entitling Plaintiffs to exemplary and/or punitive damages, together with attorneys' fees pursuant to Utah Code Ann. § 13-24-5.

165. Preliminary and permanent injunctive relief is necessary to prevent irreparable harm and further disclosure of the Moxie Affiliates' trade secrets

166.

**THIRD CAUSE OF ACTION**
**(Violation of 18 U.S.C. § 1030 – Consumer Fraud and Abuse Act**
**– Against Nielsen and Aptive)**

167. Plaintiffs hereby incorporate by reference the allegations set forth above as if fully set forth herein.

168. Nielsen intentionally accessed a computer without authorization and obtained the Moxie Affiliates' confidential information. The Moxie Affiliates restricted access to SalesRoutes information using both a technological gate and a contractual gate. The Moxie Affiliates assign specific login credentials to each sales representative. Moxie Utah assigned a specific login credential to Johnson for Johnson's use only. In addition, Moxie Utah entered into a

confidentiality agreement with Johnson. No Moxie Affiliate distributed login credentials to Nielsen or Aptive. Nielsen and Aptive circumvented the technological gate and contractual gate by bribing Johnson to hand over his login credentials. No Moxie Affiliate authorized Johnson to hand over his login credentials to a Moxie Affiliate's competitor, such as Aptive.

169. Nielsen is Aptive's President of Sales and Aptive's agent. Upon information and belief, Nielsen has authority to make decisions for Aptive and control Aptive. Given Aptive's widespread use of the Moxie Affiliates' SalesRoutes information (including Ruggio's, an Aptive President and owner), Aptive authorized and/or ratified Nielsen's actions. Thus, Aptive, through Nielsen, intentionally accessed a computer without authorization, and obtained the Moxie Affiliates' confidential information.

170. The Moxie Affiliates' confidential information was stored on a computer or computers owned by the Moxie Affiliates' provider, PestRoutes. PestRoutes is based in Texas and its computers are used in and affect interstate commerce or communication.

171. Plaintiffs have suffered damage and loss by reason of Nielsen and Aptive's intentional and unauthorized access. Nielsen and Aptive's unauthorized access has caused Plaintiffs and PestRoutes damage and loss in an amount exceeding $5,000. This includes costs associated with an investigation undertaken to determine the identity of and methods used by an offender and the extent of the offender's access. *See, e.g., Brown Jordan International, Inc. v. Carmicle*, 846 F.3d 1167 (11th Cir. 2017); *AssociationVoice Inc. v. AtHomeNet, Inc.*, No. 10–cv–00109 –CMA–MEH, 2011 WL 63508, at *6-*7 (D. Colo. Jan. 6, 2011). This also includes the loss of business costs and business goodwill as a result of the unauthorized access. This also includes the value of the information obtained in violation of the CFAA.

172. Plaintiffs are entitled to maintain a civil action against Nielsen and Aptive to obtain

compensatory damages and injunctive relief or other equitable relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1. Judgment finding Defendants jointly and severally liable to Plaintiffs on Plaintiffs' First and Second Causes of Action for trade secret misappropriation;

2. Judgment finding Nielsen, Ruggio and Moser liable to Plaintiffs on Plaintiffs' Third Cause of Action;

3. Enjoining each Defendant, and all other persons participating or acting in concert with them, from the misappropriation of or otherwise using the Moxie Affiliates' trade secrets, including use of the Moxie Affiliates' trade secrets and proprietary and confidential information to compete against any Moxie Affiliate;

4. Enjoining Nielsen, Ruggio, Moser and Smith, and all other persons participating or acting in concert with them, from engaging in the theft of the Moxie Affiliates' property, bribing others to acquire the Moxie Affiliates' property, bribing others to conceal their actions, accessing the Moxie Affiliates' information under false pretenses, and recruiting potential sales representatives using the wrongfully-obtained Moxie Affiliates' information;

5. Enjoining each Defendant, and all other persons participating or acting in concert with them, from perpetuating the wrongful acts and conduct as set forth above;

6. Ordering each Defendant to surrender to the Court or to the Moxie Affiliates all copies of the Moxie Affiliates' confidential information and/or trade secrets;

7. Ordering each Defendant to prepare an accounting of all individuals or entities to whom he/it disclosed the Moxie Affiliates' confidential information and/or trade secrets;

8. Awarding Plaintiffs compensatory damages caused by Defendants' violations of

the CFAA, UTSA and DTSA, including but not limited to damages and/or reasonable royalties in amounts to be proven at trial;

9. Awarding Plaintiffs punitive damages as permitted by law;

10. Awarding Plaintiffs their attorneys' fees and all costs of suit incurred herein;

11. Awarding Plaintiffs pre-judgment and post-judgment interest until such awards are paid;

12. Awarding Plaintiffs such other and further relief as is just and equitable.

DATED this ___ day of _____, 2026.

HATCH LAW GROUP PC

/s/ Adam M. Pace
Brent O. Hatch
Adam M. Pace

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that, on ________________, a copy of the foregoing **THIRD AMENDED COMPLAINT** was filed and served via electronic notification through the CM/ECF system on all counsel of record.

*/s/ Adam M. Pace*